IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
ST. CROIX DIVISION


VALDERIE C. ABRAMSEN, et al.   :      CIVIL ACTION
                            :
        v.              :
                            :
TOM VILSACK, IN HIS OFFICIAL   :
CAPACITY AS SECRETARY OF      :
AGRICULTURE OF THE UNITED     :
STATES OF AMERICA          :      NO. 07-31

----------

FERN CALLWOOD, et al.       :      CIVIL ACTION
                            :
        v.              :
                            :
TOM VILSACK, IN HIS OFFICIAL   :
CAPACITY AS SECRETARY OF      :
AGRICULTURE OF THE UNITED     :
STATES OF AMERICA          :      NO. 09-101


<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Bartle, J.                         October 4, 2012

        The 33 plaintiffs in these two consolidated actions are or were at one time employees of the University of the Virgin Islands in its Cooperative Extension Service ("CES").  They allege that officials of the United States Department of Agriculture ("USDA") discriminated against them on the basis of race or national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. when these officials failed to notify them about and to grant them dual

status as federal employees eligible for certain federal
retirement and other fringe benefits.[1]

The court held a two-week non-jury trial and now makes
the following findings of fact and conclusions of law.

I.

The plaintiffs in the Abramsen action are:  (1)
Valderie Abramsen (Afro-Caribbean); (2) Michael Austrie (Afro-
Caribbean); (3) Cynthia Battise (Afro-Caribbean); (4) Jacqueline
Blyden (Afro-Caribbean); (5) Kofi Boateng (African); (6) Rosalind
Browne (Afro-Caribbean); (7) Clarice Clarke (Afro-Caribbean); (8)
Sarah Dahl-Smith (Caucasian); (9) Kenneth Davis (Afro-Caribbean);
(10) Helen Dookhan (East Indian); (11) Kwame Garcia (Afro-
Caribbean-Hispanic); (12) Albion George (Afro-Caribbean); (13)
Clinton George (Afro-Caribbean); (14) Miriam Greene (Afro-
Caribbean); (15) Alice Henry (Afro-Caribbean); (16) Zoraida
Jacobs (Afro-Caribbean-Hispanic); (17) Evannie E. Jeremiah; (18)
Sue Lakos (Caucasian); (19) Randall Macedon (Afro-Caribbean);
(20) Blanche Mills (Afro-Caribbean); (21) Dale Morton (Afro-
Caribbean); (22) Orpha Penn (Afro-Caribbean); (23) Dr. Louis
Petersen (Afro-Caribbean); (24) Josephine Petersen-Springer

---

1.  Plaintiffs also brought a claim for discrimination under
Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et
seq.  We granted the motion of defendant for judgment on the
pleadings as to this claim.  See Abramsen, et al. v. Vilsack, No.
07-31 (E.D. Pa. Apr. 16, 2010).  In addition to the Secretary of
Agriculture, plaintiffs also named as a defendant the University
of the Virgin Islands ("UVI").  On November 15, 2011, we
dismissed the UVI based on the stipulation of the parties.  See
Abramsen, et al. v. Vilsack, No. 07-31 (E.D. Pa. Nov. 15, 2010).

(Afro-Caribbean); (25) Yvonne Phillips (Afro-Caribbean); (26) Carlos Robles (Afro-Caribbean); (27) Toni Thomas (Caucasian); (28) Jillean Webster (Afro-Caribbean); and (29) Carmen Wesselhoft (Afro-Caribbean).  The plaintiffs in the <u>Callwood</u> action are: (1) Fern Callwood (Afro-Caribbean); (2) Dorothy Gibbs (Afro-Caribbean); (3) Rudy O'Reilly (Afro-Caribbean); and (4) Julie Wright (Caucasian).  The defendant in both actions is the Secretary of the USDA in his official capacity.

The University of the Virgin Islands ("UVI") is a historically black institution founded in 1962.  In 1972, it became a land grant university under the First Morrill Act of 1862.  <u>See</u> 7 U.S.C. §§ 301 et seq., as amended, Pub. L. No. 92-318, Title V, § 506(b), 86 Stat. 350 (1972).  Pursuant to that statute, the UVI receives federal funds under the Smith-Lever Act to operate a CES.  <u>See</u> 7 U.S.C. §§ 341 et seq.  Currently, the UVI is required to provide to its CES additional funding equal to 50% of federal funds.  However, it has been its practice to match 100% of federal funds.  Excess funds may be carried over by the CES for up to five years.  All CES budgets must be approved by the USDA.

Each CES is headed by a State Director named by the university with which the CES is associated and then approved by the Secretary of Agriculture or his designee.  The CES's mission is to assist rural communities through research and development in agriculture and natural resources.  It includes educational programing on a variety of topics, including nutrition and

health, computer skills, personal finance, and 4-H Clubs.  The UVI-CES has personnel in St. Croix, St. Thomas, and St. John.

As part of the CES program, the USDA offered what are known as Schedule A appointments to certain university employees performing CES work.  Those employees who received such appointments would continue to be employees of the university but would receive certain federal benefits as well.  To receive an appointment, an employee needed to satisfy several criteria.  The employee must:  (1) be appointed by a federal official; (2) spend at least 50% of his or her time performing federal duties; (3) be supervised by a federal official; and (4) be a "professional" employee.  The State Director was the federal official who made the appointments at each university, if he or she had a dual appointment.  The State Director's Schedule A appointment had to be signed by the university president and the Secretary of Agriculture or his designee.

No federal statute, regulation, or document defined the term "professional" in reference to CES employees.  The UVI, however, has its own classification system for employees, including those with its CES.  Under that system, employees whose positions require specialized training and primarily performed intellectual, non-manual work are classified as professional staff.  This includes CES employees with the titles of Extension Agent, Extension Specialist, Program Leader, Assistant Director, and Director.  At the UVI, non-professional staff includes paraprofessionals who have training as a result of study at a

-4-

junior college or technical institute or simply through work
experience and who perform their work in a supportive role to the
professional staff, such as Extension Aides.  The non-
professional staff also includes those who perform clerical and
secretarial functions, such as Administrative Assistants.  All
professional staff members are eligible to participate in the
Teacher's Insurance and Annuity Association/College Retirement
Equities Fund ("TIAA-CREF").  Non-professional staff are eligible
to participate after one year of employment in the Government
Employees Retirement System of the Virgin Islands ("GERS").

A dual appointee, that is an employee with a Schedule A
appointment, was eligible to receive certain federal fringe
benefits, including participation in the Federal Employees'
Retirement System ("FERS"), which before 1987 was the Civil
Service Retirement System ("CSRS").  He or she, as a result of a
dual appointment, could also participate in the Thrift Savings
Plan, the Federal Employees Health Benefits Program, the Federal
Employees Group Life Insurance, and the Federal Employees Long
Term Care Insurance.

If a CES employee participated in FERS, both the
employee and the employer were required to make contributions
towards these benefits.  As part of its annual grant of funds to
land grant universities for CES programs, Congress appropriates
money specifically for the employer's, that is the university's,
part of the contribution under FERS for employees with Schedule A
appointments.  The amount appropriated for that purpose is

allocated among the various universities according to a formula and never covers the full employer contribution.  The land grant university, however, may use general federal grant money or its matching funds to make up the difference.  Of course, the use of these dollars for its FERS obligation reduces the funds available for other CES purposes.

By 1998, the dual appointment program had fallen out of favor with many universities due to expense and a desire to maintain uniform benefits for university employees.  Of the approximately 78 land grant universities throughout the United States and its territories at that time, only six continued to participate in the Schedule A program for CES employees:  (1) Tennessee State University; (2) Tuskegee University; (3) Cornell University; (4) University of Oregon; (5) University of Minnesota; and (6) University of Vermont.  Tennessee State University and Tuskegee University are historically black institutions.  In 2002, Congress ended the Schedule A appointment system for CES employees effective January 1, 2003.  Although new appointments could not be granted, those CES employees who received dual appointments before that date would continue to participate in FERS.

From 1976 until 1996, Dr. Darshan S. Padda ("Padda") was State Director of the UVI-CES.  Padda had been born in India and was a naturalized citizen of the United States.  He wore several other hats at the UVI in addition to that of CES State Director, including State Director of the Agricultural Experiment

-6-

Station and Vice President for Research and Land Grant Affairs at the UVI.  Padda had a Schedule A appointment, which he received at the time he was named State Director on August 2, 1976.

Padda, as the State Director and thus a federal official, granted ten dual appointments to CES employees during the years 1976 through 1982.  Eight of these appointees were Caucasians:  (1) Extension Agent Sharon Dickoff; (2) Extension Specialist George Holder[2]; (3) Extension Agent Michael Ivie; (4) Extension Agent John Matuszak; (5) Program Leader Alan Oliver; (6) Program Leader Preston Sides; (7) Extension Specialist Gordon Stearman; and (8) Extension Agent Cynthia Yobs.  One appointee was an Afro-American, Extension Specialist George Morris, while another was of Afro-Caribbean origin, Program Leader Rudolph Shulterbrandt.  There is no evidence that any of these employees participated in TIAA-CREF or GERS in addition to the federal retirement system.[3]  Each of the appointees was a professional under the UVI classification system.

During this same six-year period, eleven professional CES employees were hired as Extension Agents but not offered Schedule A appointment.  Five were Caucasians:  (1) Dean Cosper;

_____

2.  Holder had been recruited from a university in Texas, where he previously held a Schedule A appointment.

3.  The record shows that only Padda and his predecessor, Dr. Fenton Sands, participated in both TIAA-CREF and the federal retirement system.

(2) Walter Knausenberger; (3) Sarah Dahl-Smith[4]; (4) Marty Ann Terry; and (5) Mary King Wilson.   Six were Afro-Caribbeans:   (1) Marilyn Daniels; (2) Kwame Garcia; (3) Clinton George; (4) Olivia Henry[5]; (5) Zoraida Jacobs; and (6) Clinton Robles.

From April 1982 until he went on a leave of absence as State Director in October, 1996 prior to his retirement, Padda did not approve any Schedule A appointments.   During this 14-year span, thirteen Caucasian, one Hispanic, and at least five Afro-Caribbean employees were hired by Padda at the CES and classified as professional staff by UVI.   In addition, Padda never offered or approved a Schedule A appointment for a non-professional employee.

In 1989, Padda completed a USDA benefits survey in which he reported that the UVI-CES was no longer giving federal appointments to new employees.   In response to a second USDA benefits survey in 1996, he stated that one CES employee was currently covered by FERS (Padda) and that no new federal appointments were being granted.   Unlike the 1989 survey, the 1996 survey asked why appointments were not being made.   Padda responded:   "Uniformity of University benefits."

---

4.   Sarah Dahl-Smith is married to a man of Afro-Caribbean origin, whom she was dating at the time she was initially hired by Padda.

5.   Olivia Henry testified at trial that Padda offered her the opportunity to become a federal employee but never mentioned anything about her participation in FERS.

Kwame Garcia ("Garcia"), an Afro-Caribbean-Hispanic individual, was appointed interim State Director in October, 1996 while Padda was on an extended leave of absence.  On February 28, 1997 Padda retired and Garcia became State Director on March 5, 1997.  No dual appointment was offered to him.  In August, 1997, while looking over the UVI-CES budget with his assistant, Raquel Santiago Silver, Garcia learned that Padda had been a Schedule A appointee with federal retirement benefits.  At that point, he did not know that Padda had granted appointments to other employees.

On September 9, 1997, Silver, at Garcia's request, emailed Bonnie Beavers, a Personnel Management Specialist with the Human Resources Division of the USDA, to inquire about Schedule A appointments.  Beavers responded by email that she believed that "it may be permissible to grant Federal appointments to new hires" but that "[t]here [was] no legal provision to permit granting a Federal appointments [sic] to current employees who have already been appointed" and that she would research the issue further.

Several months later, in November, 1997, Garcia attended a USDA conference for new state CES directors in Washington, D.C.  He was accompanied by Kofi Boateng, the Assistant State Director for UVI-CES.  Boateng had participated in a USDA fellowship program in 1996 in which he spent time working with the USDA Office of Civil Rights.  During the course of the fellowship, Boateng had learned that some employees of CES

-9-

in the mainland United States had Schedule A appointments and
that Padda had such an appointment.

　　　　While at the 1997 conference in Washington, D.C.,
Garcia and Boateng visited with Curtiland Deville ("Deville"),
the Equal Opportunity Director for the Cooperative State
Research, Education, and Extension Service ("CSREES") within the
USDA.[6]  At that time, Garcia informed Deville that the UVI-CES
would like to participate in the Schedule A appointment program.
Garcia also mentioned to Deville that the UVI-CES may have been
excluded from the dual appointment program because it was a
predominantly Afro-Caribbean institution.  Deville referred them
to Beavers.

　　　　Garcia and Boateng then met briefly with Beavers and
Josephine Harris, a Human Resources Division Team Leader within
the USDA.  Beavers informed Garcia and Boateng that a dual
appointment could only be made at the time of initial permanent
employment with the CES and could not be granted retroactively.
Garcia and Boateng had joined the CES in 1979 and 1984
respectively.  Garcia responded to Beavers by pointing out that
the UVI was a historically black institution.  Beavers then
stated that she would look into the matter.

　　　　On June 3, 1998, Dr. Colien Hefferan ("Hefferan"),
Acting Administrator for CSREES, sent an email to Garcia and all
other CES directors and administrators informing them that FERS

---

6.  CSREES is now known as the National Institute of Food and
Agriculture ("NIFA").

-10-

open season would be held from July 1 through December 31, 1998.
The email further stated:  "This Open Season enrollment period
requires that all Cooperative Extension Service (CES)
organizations offer and permit all Federal appointees covered by
CSRS [Civil Service Retirement System] ... the opportunity to
elect to transfer to FERS."  The open season did not apply to all
CES employees but only those who had previously been part of the
CSRS which had been replaced in the 1980's by FERS.  Garcia gave
a copy of Hefferan's email to Silver and plaintiffs Clarice Clark
and Kofi Boateng for their information.

On June 8, 1998, Garcia sent a letter to Hefferan.[7]
The letter stated:

> The employees at the Cooperative
> Extension Service of the University of the
> Virgin Islands have expressed their
> willingness to participate in the federal
> retirement system.  We currently have no
> employees in the V.I. CES who are covered by
> any of the federal retirement benefit
> programs.  Our local employees were not
> provided the information necessary for them
> to make a decision regarding federal
> appointments.  Consequently, no one is
> registered with a federal appointment.
>
> I, therefore, request permission from
> the CSREES to allow V.I. CES employees to
> begin to participate in the federal
> retirement system during the FERS open
> season.
>
> Additionally, I am requesting your
> assistance in having someone from your
> department to orientate our staff in the
> federal retirement system.

---

7.  He did not copy Deville on the letter.

Upon receipt, Hefferan passed Garcia's letter on to Beavers. Beavers' assistant Betty Lou Gilliland in turn passed it on for a response to Josephine Harris who had only recently been assigned as the Team Leader responsible for the CSREES human resources program. Harris was unfamiliar with Schedule A appointments.

A number of months then passed with no further activity concerning Schedule A appointments. On February 18, 1999, Garcia left a note for Silver, his assistant. It asked: "What happened to the retirement inquiries?" In response, Silver left a telephone message for Beavers on February 25, 1999. Beavers attempted to return Silver's call but was unsuccessful in reaching her.

In February, 1999, Garcia sent a memorandum to Stafford Crossman, a CES Extension Program Supervisor, informing Crossman of his eligibility for a Schedule A appointment. Garcia also transmitted a memo on March 17, 1999 to Warren Petty, the UVI Human Resources Supervisor. In that memo, Garcia stated that he desired to join the federal retirement system as soon as possible. He requested the assistance of the UVI's human resource office in preparing the necessary paperwork. Garcia did not hear further from Petty and did not follow up with him. There is no record of any further communications with Crossman about a Schedule A appointment.

Harris at the USDA in Washington, D.C. did not mail a response to Garcia's June 8, 1998 letter to Hefferan until

-12-

March 18, 1999, some nine months after it had been received.
After consultation with other USDA personnel, she wrote:

> This letter is in response to your request to
> have the Virgin Island Cooperative Extension
> Service (CES) participate in the Federal
> Retirement System.  Unfortunately we are
> unable to approve your request at this time.
> A project to review and revise the CES
> employment manual is underway and the end
> result of this project may or may not have an
> impact on the CES Federal Appointees
> throughout the country.  We will hold on to
> your request and once the project is
> completed and the Federal provisions,
> processes, and procedures are revised to
> reflect the current Federal environment we
> will consider your request to grant Federal
> appointments/retirement for your staff.
>
> If you have any questions or need additional
> information, please contact me on 202-720-
> 3676.

Thereafter, Harris was out of the office for a period
of extended sick leave.  On her return, she had forgotten about
the letter and the need for further consideration of Garcia's
request.  Around this time, there was discussion within the USDA
about termination of the Schedule A appointment program because
it had become increasingly difficult to manage and expensive for
the universities.  There was also concern because of recent
litigation in which two CES employees had instituted action
against the USDA to challenge certain adverse employment actions
taken against them by a CES director.  See Simmons, et al., v.
Dep't of Agriculture, 80 M.S.P.B. 380 (1988).  After receiving
Harris's March 19, 1999 letter, Garcia did not pursue the matter
with her or with anyone else at the USDA.

-13-

It was not until some five years later, in 2004, that the issue of Schedule A appointments surfaced among the employees at the UVI-CES.  By this time, Garcia and at least some of the plaintiffs had learned that Congress had prohibited any new Schedule A appointments as of January 1, 2003.

On March 9, 2004, Boateng presided over a UVI-CES staff meeting at which several plaintiffs were present.  Boateng informed the group that an advocate for black employees had agreed to assist the UVI-CES to draft a letter to the USDA about FERS.  He also stated that he, along with Garcia and several other UVI-CES staff, had approached an attorney regarding the possibility that federal benefits had been denied to them and how much it would cost to participate in the federal benefit program. The possibility of joining FERS was again discussed at staff meetings on June 8, 2004, September 15, 2004, and December 15, 2004.  On May 9, 2005, and May 25, 2005, UVI-CES staff again convened with the sole purpose of discussing the federal retirement system.

Members of the UVI-CES staff met with an attorney on July 28, 2005 to discuss the possibility of gaining federal benefits.  Finally, on November 8, 2005, several plaintiffs conferred with Warren B. Cole, Esquire about the issue.  He was engaged to represent the plaintiffs in this litigation. Beginning in and following January, 2006, Cole mailed on behalf of all 33 plaintiffs administrative complaints concerning the

alleged discrimination to the Office of Civil Rights for the USDA in Washington, D.C.

II.

First, the government seeks judgment against plaintiffs Valderie Abramsen, Rosalind Browne, Fern Callwood, Dorothy Gibbs,[8] and Josephine Petersen-Springer, all of whom are former CES employees at the UVI. None of these plaintiffs appeared at the trial and none was deposed. As noted above, each plaintiff would have to make employee contributions if he or she had a Schedule A appointment and joined FERS. Absent from the record is any evidence that they would have joined the federal retirement system in addition to or in lieu of their existing retirement program even if given the opportunity. Nor did the government have the opportunity to examine them on when they discovered their alleged injuries. Abramsen was a clerk typist at the UVI-CES and in any event was not eligible for a Schedule A appointment since she was not a professional.

Accordingly, the court will enter judgment against these five plaintiffs.

III.

The government also maintains that the claims of 24 other plaintiffs are barred for failure to have initiated timely contact concerning the alleged discrimination with the Office of Civil Rights of the USDA. These plaintiffs are Michael Austrie,

---

8. Before trial, we appointed a guardian ad litem for Gibbs. See Abramsen, No. 07-31 (E.D. Pa. Aug. 6, 2012).

-15-

Cynthia Battiste, Jacqueline Blyden, Kofi Boateng, Clarice Clark, Sarah Dahl-Smith, Kenneth Davis, Helen Dookhan, Kwame Garcia, Albion George, Clinton George, Miriam Greene, Evannie Jeremiah, Sue Lakos, Randal Macedon, Blanche Mills, Dale Morton, Orpha Penn, Louis Petersen, Jr., Yvonne Phillips, Carlos Robles, Toni Thomas, Jillean Webster, and Carmen Wesselhoft.

Title VII prohibits departments and agencies of the federal government, with exceptions not relevant here, from engaging in discrimination against employees or applications for employment based on race, color, religion, sex, or national origin. See 42 U.S.C. § 2000e-16. Under implementing regulations, aggrieved federal employees and applicants for federal employment are required to initiate contact with a counselor in the relevant department "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1); see also Shenken v. Potter, 71 F. App'x 893, 894-96 (3d Cir. 2003). This time period is in the nature of a statute of limitations, which the government raised as an affirmative defense in its answers to plaintiffs' complaints. See Burgh v. Borough of Montrose, 251 F.3d 465, 470 (3d Cir. 2001).

The 45-day limitations period is always subject to the discovery rule and to equitable tolling as is the case of the statute of limitations in other types of actions. Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 (3d Cir.

1994).  The discovery rule provides that a federal claim accrues when a victim becomes aware or reasonably should become aware of an injury.  Id. at 1386.  The victim does not have to know that the injury constitutes a legal wrong.  Id. at 1386, 1391.  In the case of discrimination, the time begins to run when the victim knows that the discriminatory act occurred, not "the date the victim first perceived that a discriminatory motive caused the act."  Id. at 1387 (citing Merrill v. Southern Methodist Univ., 806 F.2d 600, 604-05 (5th Cir. 1986)).

The equitable tolling doctrine stops the running of the limitations period for a claim which has accrued when, among other things, the defendant actively misled the victim respecting the claim.[9]  Id.  The clock does not start to tick until the date when the facts supporting the cause of action become apparent or should become apparent to a reasonably prudent person.  The discovery rule and the equitable tolling doctrine each "requires a level of diligence on the part of the plaintiff; that is, each requires the plaintiff to take reasonable measures to uncover the existence of injury."  Id. at 1390.

The evidence is undisputed that Padda, the State Director of the UVI-CES, did not himself offer to any of the plaintiffs who were hired during his tenure the opportunity to be appointed as federal employees for the purpose of participating

---

9.  The time is also tolled "where the plaintiff in some extraordinary way has been prevented from asserting his or her rights" or "where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum."  Oshiver, 38 F.3d at 1387.

in FERS.  At the time they were hired they were unaware that the dual appointment program existed, that Padda himself had such an appointment, or that Padda had made such appointments for ten CES employees between 1976 and 1982.

Each of these plaintiffs, through counsel, mailed an informal complaint and a program complaint to the office of Civil Rights of the USDA in Washington, D.C. in early 2006.  The informal complaints of 18 plaintiffs, namely Michael Austrie, Cynthia Battiste, Sarah Dahl-Smith, Kenneth Olasee Davis, Albion George, Clinton George, Miriam Greene, Evannie Jeremiah, Sue Lakos, Randal Macedon, Blanche Mills, Dale Morton, Yvonne Phillips, Carlos Robles, Toni Thomas, Jillean Webster, and Carmen Wesselhoft, were mailed on January 23, 2006.  Those of plaintiffs Jacqueline Blyden, Clarice Clark, Helen Dookhan, Louis Petersen, Jr., and Orpha Penn were not sent until February 1, 2006 and those of Kwame Garcia and Kofi Boateng, not until March 30, 2006. The mailings were the plaintiffs' "initial contacts" with the appropriate agency concerning discrimination as required under 29 C.F.R. § 1614.105.

In response to questionnaires thereafter submitted by the Office of Civil Rights, each plaintiff certified that he or she did not learn until sometime in November, 2005 about his or her eligibility for a dual appointment with federal benefits and that remedies existed for the failure to have been informed.  For example, Cynthia Battiste stated:

I first learned of the fact that CES
employees generally were or had been eligible
for dual appointment and the receipt of
federal employment benefits in late 1998 or
early 1999 when the new Director, Mr. Kwame
Garcia, returned from a meeting in Washington
D.C.  Based upon the information I received
from Mr. Garcia, I understood that CES
employees in the Virgin Islands were not
eligible, unlike those similarly employed in
the United States....  I understand that Mr.
Garcia received a letter from U.S.D.A. in
March of 1999 confirming that Virgin Islands
employees could not participate in the
Federal Retirement System.  At that point I
assumed that I was not eligible for an
Excepted Service appointment.

In May of 2005 I learned that the program of
dual appointments had been discontinued
effective January 31, 2003....  At that point
I and a number of other CES staff decided to
seek legal advice regarding our status.  It
was not until November of 2005 that I became
aware that in fact Virgin Islands CES
employees had been eligible for appointment
... and that potential remedies did exist for
the fact that this information had not been
given to us at the time of our initial
employment.

In answer to his questionnaire, Kofi Boateng responded:

In July of 1996 I participated in the CSREES
Fellows Program in Washington D.C.. [sic]
During one of the orientation meetings I
learned that all of the other interns (other
than myself) were federal employees under
dual appointment and enjoyed federal
employment benefits.  I then made inquiry
with CES in the Virgin Islands, and learned
that no CES employee in the Virgin Islands
had been given a dual appointment other than
the State Director, Dr. Darshan S. Padda.

After my promotion to Assistant Director [of
UVI-CES], I attended a CES meeting in late
1998 or early 1999 in Washington, D.C. at the
Department of Agriculture together with the
State Director, Mr. Kwame Garcia.  On that
occasion we met Ms. Bonnie Beavers and Ms.
Josephine V. Harris, of USDA CSREES Human
Resources to request clarification of the

-19-

> status of CES employees in the Virgin Islands
> and, if possible, their inclusion in the dual
> appointment program and participation in
> federal employment benefits.  We were told by
> Ms. Beavers and Ms. Harris that participation
> in the system required the election to
> participate within one year of initial
> employment....
>
> Based upon the statements made to me by Ms.
> Beavers, Ms. Harris, and Dr. [Charles]
> Laughlin, [the USDA CSREES Administrator], I
> came to the reluctant conclusion that there
> were no means of correcting the inequity that
> existed between CES employees in the Virgin
> Islands and CES employees in the United
> States.
>
> In May of 2005 I learned that the program of
> dual appointments had been discontinued
> effective January 31, 2003 but that CES
> employees that had received such appointments
> prior to that date would continue to receive
> and participate in federal benefits....  At
> that point I and a number of other CES staff
> decided to seek legal advice regarding our
> status.  It was not until November of 2005
> that I became aware that potential remedies
> did exist contrary to the impression I was
> given by Ms. Beaver, Ms. Harris, and Dr.
> Laughlin.

Through their own admissions in these questionnaires, plaintiffs
have established that they were aware by November, 2005, at the
very least, that they were potentially eligible for Schedule A
appointments and that they had not been offered such appointments
when hired.

More specifically, most of the questionnaires also
reference:  (1) that the USDA had denied Garcia's 1998 request
for participation in the Schedule A appointment program; and (2)
that at least one CES employee at the UVI, namely Padda, had such
an appointment.  Even if some of the plaintiffs did not mention
these specific facts in their administrative complaints filed

-20-

with the Office of Civil Rights of the USDA, they had imputed knowledge of these facts in November 2005 by virtue of their joint representation by Attorney Cole.  See, e.g., In re Kensington Int'l Ltd., 368 F.3d 289, 315 (3d Cir. 2004).

To avoid any dispute over the effect of the discovery rule or the equitable tolling doctrine, the government has willingly conceded that the 45 day limitations period began to run at the end of November, 2005.  Even so, the mailing of the informal and program discrimination complaints did not take place until January 23, 2006, February 1, 2006, and March 30, 2006. These dates are all more than 45 days after the end of November, 2005.[10]

At oral argument, plaintiffs' counsel conceded that the administrative complaints were filed after the 45-day period expired but suggested that plaintiffs' claims were not time barred if Garcia's meeting with Curtiland Deville in November, 1997 was the initial contact required under 29 C.F.R. § 1614.105. According to this theory, Deville was then obligated to inform Garcia in writing of his rights and responsibilities under Title VII and his failure to do so tolled the statute of limitations. See id.

A plaintiff may satisfy the informal contact requirement by "initiating contact with any agency official

---

10.  By relying on the date of mailing by plaintiffs, we are in no way implying that this is the critical date on which an administrative complaint would be deemed filed.  See 29 C.F.R. § 1614.106(e).  Neither party has submitted evidence regarding when the complaints were actually received by the Office of Civil Rights at the USDA.

logically connected with the EEO process, even if that official is not an EEO Counselor, and by exhibiting an intent to begin the EEO process." Culpepper v. Schafer, 548 F.3d 1119, 1122 (8th Cir. 2008) (citing E.E.O.C. Management Directive 110, at ch. 2, § I.A, n.1 (Nov. 9, 1999)).  Even assuming that Deville was such an agency official, this contact cannot satisfy the requirements of 29 C.F.R. § 1614.105.  The evidence at trial demonstrated that the meeting between Deville and Garcia was extremely brief and simply did not demonstrate an intent to begin the EEO process on behalf of Garcia or any other plaintiff.  Moreover, even if the meeting that Garcia and Boateng had with Deville was the initial contact as required under § 1614.105, it too was untimely.  As stated above, the contact occurred in November, 1997.  Garcia was aware of the federal appointments under Schedule A in August, 1997 at the latest and Boateng by sometime in 1996.

Accordingly, the claims of these 24 plaintiffs concerning discrimination are barred by the 45-day limitations period under 29 C.F.R. § 1614.105.

IV.

There remain only the claims of Alice Henry, Zoraida Jacobs, Rudy O'Reilly, and Julie Wright arising out of the alleged discrimination of Padda against them on the basis of race and national origin.  As discussed above, Title VII of the Civil Rights Act of 1964 provides that "[a]ll personnel actions affecting employees or applicants for employment [with the federal government] shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42

-22-

U.S.C. § 2000e-16(a).  To establish a prima facie case under Title VII, plaintiffs must show that:  (1) they are members of a protected class; (2) they were otherwise qualified; (3) they suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination.[11]  Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318-19 (3d Cir. 2000); Harley v. Caneel Bay, Inc., 193 F. Supp. 2d 833, 835 (D.V.I. 2002).

If plaintiffs succeed in proving the prima facie case by a preponderance of the evidence, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the defendant meets this burden, plaintiffs must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely pretext for discrimination and that race or national origin was a determinative factor in the defendant's decision.[12]  Id.; see also Watson v. Se. Pa. Transp. Auth., 207 F.3d 207, 215-16 (3d Cir. 2000).

---

11.  We note that generally the question of whether a plaintiff has satisfied his or her prima facie case is a question of law for the court and not a matter on which to instruct a jury.  See Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 348 n.1 (3d Cir. 1999).  Such distinction is not relevant in a non-jury case, as is the situation here.

12.  This is in contrast to a mixed-motives disparate treatment case, in which a plaintiff offers direct evidence of discrimination.  See Miller v. CIGNA Corp., 47 F.3d 586, 594 (3d Cir. 1995) (citing Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)).  In that situation, a plaintiff need only prove that race was a "motivating factor."  See Watson, 207 F.3d at 215-16.

Plaintiffs Henry, Jacobs, and O'Reilly are of Afro-Caribbean origin and thus members of a protected class. Julie Wright, however, is a Caucasian individual from the continental United States. Although our Court of Appeals has not addressed the issue, several other courts have held that "Title VII protects individuals who, though not members of a protected class, are 'victims of discriminatory animus toward [protected] third persons with whom the individuals associate.'" Barrett v. Whirlpool Corp., 556 F.3d 502, 512 (6th Cir. 2009) (quoting Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc., 173 F.3d 988, 994 (6th Cir. 1999)); see also Holcomb v. Iona College, 521 F.3d 130, 139 (2d Cir. 2008); Young v. St. James Management, LLC, 749 F. Supp. 2d 281, 292 (E.D. Pa. 2010). Wright is a member of the CES staff at UVI, a historically black university which is composed predominantly of those of Afro-Caribbean origin. Accordingly, we will assume without deciding that she is a member of a protected class by virtue of her association with UVI-CES.

All four of these plaintiffs were otherwise qualified to receive a Schedule A appointment. Each holds a Bachelor's Degree. In addition, Henry, O'Reilly, and Wright have Master's Degrees. All four were hired by Padda into positions classified as professional by UVI. The government does not challenge the eligibility of these four plaintiffs for a Schedule A appointment.

The failure of Padda to inform plaintiffs of the Schedule A appointment program and the refusal of the USDA to

-24-

allow the UVI-CES to join the program constitute adverse
employment actions because it is in effect "a decision causing a
significant change in benefits" that "inflicts direct economic
harm." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761-62
(1998).

That leaves the ultimate question, which is whether
race or national origin was a determinative factor in the actions
of Padda and later the USDA.  See Watson, 207 F.3d at 215-16.
The only evidence that plaintiffs have adduced in this regard is
statistical.  As discussed above, from the period of 1976 to
1982, eight of the Schedule A appointments approved by Padda went
to Caucasian individuals from the continental United States while
he approved only one for an Afro-Caribbean employee and one for
an African-American employee recruited from the mainland United
States.  Filling out the picture, five Caucasian and six Afro-
Caribbean professional CES employees hired during this same
period did not receive Schedule A appointments.

The government has claimed that the failure of Padda to
offer Schedule A appointments to plaintiffs was based on a
legitimate, nondiscriminatory reason.  In his deposition, Padda
testified that he did not know who was eligible for a Schedule A
appointment and that he was not responsible for explaining
benefits to his employees.  He pointed out that while other CES
organizations had their own personnel offices, the CES at UVI did
not have such a department because it was a small organization.
It instead relied on the personnel office of the UVI.  Padda
further stated that while he did not offer plaintiffs Schedule A

-25-

appointments, he did not deny anybody who came to him requesting
such appointment.  While he did sign the Schedule A appointments
of ten individuals between 1976 and 1982, there is no evidence
that he ever notified or discussed with any of them their
eligibility for such appointments.  Instead, these individuals
had prior knowledge of the Schedule A appointment program and
approached him regarding the appointments on their own
initiative.  We accept his testimony as credible.  Padda was a
Vice President of the UVI and had significant responsibilities in
addition to being the CES State Director.  There is nothing in
the record to establish that it was Padda's role to act as a
personnel or human resources officer for the CES employees who
were, of course, employees of the UVI.

Significantly, during the period from 1982 to the end
of Padda's tenure in 1996, no Schedule A appointments were made
due to the policy of the UVI to maintain uniformity of benefits
between CES employees and the other employees at the UVI.
Thirteen Caucasians, one Hispanic, and at least five Afro-
Caribbean professional employees at UVI-CES did not receive such
an appointment during this time.

Under the totality of circumstances, the statistics
regarding the race and national origin of employees eligible for
Schedule A appointments during Padda's tenure do not warrant a
finding that race or national origin was ever a motivating factor
in his actions or inactions.

Plaintiffs Henry, O'Reilly, and Wright were all hired
during the period when Padda was no longer offering Schedule A

appointments while Jacobs was hired while appointments were still being made.  Aside from the failure to offer them appointments, none of these four plaintiffs or any other plaintiff for that matter came forward with any evidence that Padda ever failed to grant them promotions or salary increases, assigned them less desirable work, created for them an unpleasant work environment, made disparaging remarks about them, or treated them differently in any other way because of their race or national origin.

Plaintiffs have also alleged that the USDA in Washington, D.C. intended to discriminate against them when it denied Garcia's request in 1998 for his staff at the UVI-CES to join the Schedule A appointment program.  The evidence at trial established that the USDA's handling of Garcia's request was certainly not its finest hour.  Garcia's letter was punted to Harris, who by her own admission was not familiar initially with how Schedule A appointments were made or which universities participated in the program.  It took her nine months to consult with other USDA officials and respond to Garcia's letter.  When she did answer it, her letter was vague and unhelpful.  Although she stated that Garcia's request could not be granted in part because of the need to revise the forms and manuals used to make Schedule A appointments, other universities continued to make Schedule A appointments and to use outdated forms at the time of Garcia's request.  Furthermore, the revisions to the forms used to make the appointments were not completed until three years later, in March, 2002.  Other USDA personnel appear to have been

equally confused about who had the authority to make such appointments and whether they could be made retroactively.

Proof that an employer's explanation for an adverse employment action is unworthy of credence is a form of circumstantial evidence that can be highly probative of intentional discrimination.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).  However, the Supreme Court has cautioned:

> [T]he factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff.  The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct."  In other words, "[i]t is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."

Id. (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 524, (1993)).  Our Court of Appeals has echoed this sentiment:  "To discredit the employer's proffered reason ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

As discussed above, at the time of Harris's response, many universities had abandoned the Schedule A appointment system because of its expense and complexity.  The USDA was considering

terminating this program for these reasons and, as discussed above, because of a recent lawsuit against it.  See Simmons, 80 M.S.P.B. 380.  It is true that the USDA's response to Garcia was less than forthright regarding the potential termination of Schedule A appointments.  Id.  Its response to Garcia's request was not "wise, shrewd, prudent, or competent."  See Fuentes, 32 F.3d at 765.  The USDA failed to fulfill its duty to provide information and assistance to Garcia.  Nonetheless, racial or national origin discrimination was not a determinative factor in its response to Garcia in 1999 and its failure to follow up. Indeed, while this unfortunate series of events was taking place, historically black institutions, namely Tennessee State University and Tuskegee University, were continuing to make Schedule A appointments approved by the USDA.

In sum, none of the 33 plaintiffs has proven that Padda or any other federal official at the USDA in Washington, D.C. engaged in intentional discrimination on the basis of race or national origin, that is, that race or national origin was a motivating factor, with respect to Schedule A appointments for CES employees at the UVI, even assuming without deciding that all plaintiffs were professional employees eligible for such appointments.

Accordingly, judgment will be entered in favor of the defendant the Secretary of Agriculture and against plaintiffs Henry, Jacobs, O'Reilly, and Wright on their claims of discrimination under Title VII.  As to the remaining 29

plaintiffs, the defendant is also entitled to judgment against them on this ground as well as the other grounds stated above.